Slip Op. 09-151

UNITED STATES COURT OF INTERNATIONAL TRADE

_____
                                        :
AD HOC SHRIMP TRADE ACTION              :
COMMITTEE,                              :
                                        :
         Plaintiff,                     :
                                        :        Before:         WALLACH, Judge
         v.                             :        Consol. Court No.:   08-00283
                                        :
UNITED STATES,                          :        **PUBLIC VERSION**
                                        :
         Defendant,                     :
                                        :
         and                            :
                                        :
PAKFOOD PUBLIC COMPANY                  :
LIMITED et al.,                         :
                                        :
         Defendant-Intervenors.         :
_____:


[Plaintiff Ad Hoc Shrimp Trade Action Committee's Motion for Judgment on the Agency
Record is DENIED, and the Agency's Determination is AFFIRMED IN PART and
REMANDED IN PART to address Plaintiffs Andaman Seafood Co., Ltd. et al.'s Motion for
Judgment on the Agency Record.]

                                 Dated:              December 29, 2009


Pickard, Kentz and Rowe, LLP (Andrew W. Kentz and Nathaniel Maandig Rickard) for Plaintiff
and Defendant-Intervenor Ad Hoc Shrimp Trade Action Committee.

White & Case LLP (Walter J. Spak, Christopher F. Corr, and Jay C. Campbell) for Plaintiffs and
Defendant-Intervenors Andaman Seafood Co., Ltd., Chanthaburi Frozen Food Co., Ltd.,
Chanthaburi Seafoods Co., Ltd., Phatthana Seafood Co., Ltd., Phatthana Frozen Food Co., Ltd.,
Thailand Fishery Cold Storage Public Co., Ltd., Thai International Seafoods Co., Ltd., and
Rubicon Resources, LLC.

Tony West, Assistant Attorney General; Jeanne E. Davidson, Director, Franklin E. White, Jr.,
Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice
(Stephen C. Tosini and Joshua E. Kurland), for Defendant United States.

Trade Pacific PLLC (Robert G. Gosselink and Jonathan M. Freed) for Defendant-Intervenors
Pakfood Public Company Limited, Asia Pacific (Thailand) Company Limited, Chaophraya Cold

Storage Company Limited, Okeanos Company Limited, Takzin Samut Company Limited, and Yeenin Frozen Foods Company Limited.

Akin, Gump, Strauss, Hauer & Feld, LLP (Warren E. Connelly and Jarrod M. Goldfeder) for Defendant-Intervenors Thai Union Seafood Co., Ltd. and Thai Union Frozen Products Public Co., Ltd.

## OPINION

**Wallach, Judge:**

## I
## INTRODUCTION

This action arises out of the administrative review of an antidumping duty order covering certain warmwater shrimp from Thailand conducted by the U.S. Department of Commerce ("Commerce" or the "Department").  Plaintiff/Defendant-Intervenor Ad Hoc Shrimp Trade Action Committee ("Ad Hoc" or the "Committee")[1] and Plaintiffs/Defendant-Intervenors Andaman Seafood Co., Ltd., Chanthaburi Frozen Food Co., Ltd., Chanthaburi Seafoods Co., Ltd., Phatthana Seafood Co., Ltd., Phatthana Frozen Food Co., Ltd., Thailand Fishery Cold Storage Public Co., Ltd., Thai International Seafoods Co., Ltd., and Rubicon Resources, LLC (collectively, the "Rubicon Group")[2] challenge Commerce's determinations in Certain Frozen Warmwater Shrimp From Thailand: Final Results and Final Partial Rescission of Antidumping Duty Administrative Review, 73 Fed. Reg. 50,933 (August 29, 2008), Public Record ("P.R.") 522 ("Final Results").  This court has jurisdiction pursuant to 28 U.S.C. § 1581(c).  Each

---

[1] Ad Hoc is Plaintiff in Court No. 08-00283 and Defendant-Intervenor in Court No. 08-00330, which were consolidated under Consol. Court No. 08-00283 on March 17, 2009.

[2] The Rubicon Group is Defendant-Intervenor in Court No. 08-00283 and Plaintiff in Court No. 08-00330, which were consolidated under Consol. Court No. 08-00283 on March 17, 2009, and was defined in the administrative proceedings as including additional entities. See Certain Frozen Warmwater Shrimp From Thailand: Preliminary Results and Preliminary Partial Rescission of Antidumping Administrative Review, 73 Fed. Reg. 12,088, 12,088 (March 6, 2008), Public Record ("P.R.") 249 ("Preliminary Results").

Commerce action challenged by Ad Hoc is sustained as being supported by substantial evidence and in accordance with law.  The lone aspect of the <u>Final Results</u> challenged by the Rubicon Group is remanded to Commerce, as requested by Defendant United States ("Defendant").

## II
## BACKGROUND

### A
### <u>Initiation Of The Subject Antidumping Review And Respondent Selection</u>

Ad Hoc is an association comprised primarily of domestic producers, processors, and wholesalers of warmwater shrimp. Ad Hoc Complaint ¶ 7.  In February 2007, Ad Hoc requested an antidumping review of sales in the United States of certain frozen warmwater shrimp by numerous Thai shrimp producers. <u>Notice of Initiation of Administrative Reviews of the Antidumping Orders on Certain Frozen Warmwater Shrimp from Brazil, Ecuador, India and Thailand</u>, 72 Fed. Reg. 17,100, 17,101 (April 6, 2007) ("<u>Initiation Notice</u>").  Commerce in April 2007 initiated the review of an antidumping order covering 142 companies for the period of review ("POR") from February 1, 2006, through January 31, 2007. <u>Id.</u> at 17,100–10.  The <u>Initiation Notice</u> set forth Commerce's intent with respect to the selection of respondents as follows:

> Due to the large number of firms requested for these administrative reviews and the resulting administrative burden to review each company for which a request has been made, the Department is exercising its authority to limit the number of respondents selected for review. . . .  In selecting the respondents for individual review, the Department intends to select the largest exporters/producers by U.S. sales/export volume.

<u>Initiation Notice</u>, 72 Fed. Reg. at 17,110 (citation omitted).

Ad Hoc in May 2007 objected to Commerce's intent to select respondents by the largest

volume, contending that it was "unprecedented and a deviation, without notice or viable explanation, from prior Department practice." Letter from Bradford L. Ward, Dewey Ballantine LLP, to the Honorable Carlos M. Gutierrez, Secretary of Commerce, U.S. Department of Commerce, Re: Second Antidumping Duty Administrative Review of Certain Warmwater Shrimp from Brazil, China, Ecuador, India, Thailand, and Vietnam (2006-2007): Respondent Selection and Request for Verification, P.R. 149 ("May 22, 2007 Letter"), at 2.

Commerce thereafter set a June 13 deadline for what it called "a final opportunity to comment on the Department's intended respondent selection methodology." Letter from James P. Maeder, Director, AD/CVD Operations, Office 2, U.S. Department of Commerce, to All Interested Parties (June 6, 2007), P.R. 180 ("June 6, 2007 Letter"), at 1.  Ad Hoc timely filed a submission encouraging Commerce to select respondents through sampling and again objecting to the announcement of intent to select by volume in the Initiation Notice. Letter from Bradford L. Ward, Dewey Ballantine LLP, to the Honorable Carlos M. Gutierrez, Secretary of Commerce, U.S. Department of Commerce, Re: Second Antidumping Duty Administrative Review of Certain Warmwater Shrimp from Thailand (2006-2007): Respondent Selection and Requests for Verification (June 13, 2007), P.R. 187 ("June 13, 2007 Letter").

After receiving comments, Commerce in July 2007 announced that due to "resource constraints" it would "limit examination to four" of the producers/exporters subject to the review. Memorandum from James P. Maeder, Director, AD/CVD Operations, Office 2, U.S. Department of Commerce, to Stephen J. Claeys, Deputy Assistant Secretary for Import Administration, Re: 2006-2007 Antidumping Duty Administrative Review on Certain Frozen Warmwater Shrimp from Thailand (July 19, 2007), P.R. 219 ("Respondent Selection Memo").

Commerce selected:

- the Rubicon Group;

- Defendant-Intervenors Pakfood Public Company Limited, Asia Pacific (Thailand) Company Limited, Chaophraya Cold Storage Company Limited, Okeanos Company Limited, Takzin Samut Company Limited, and Yeenin Frozen Foods Company Limited (collectively, "Pakfood");[3]

- Thai I-Mei Frozen Foods Co., Ltd. ("Thai I-Mei"); and

- Defendant-Intervenors Thai Union Seafood Co., Ltd. and Thai Union Frozen Products Public Co., Ltd. (collectively, "Thai Union").

Certain Frozen Warmwater Shrimp From Thailand: Preliminary Results and Preliminary Partial Rescission of Antidumping Duty Administrative Review, 73 Fed. Reg. 12,088, 12,088–89 (March 6, 2008), P.R. 422 ("Preliminary Results").

Commerce sent questionnaires to the four selected mandatory respondents on the day that it issued the Respondent Selection Memo. Id. at 12,089. Ad Hoc subsequently objected to the selection of four respondents. Letter from Bradford L. Ward, Dewey Ballantine LLP, to the Honorable Carlos M. Gutierrez, Secretary of Commerce, U.S. Department of Commerce, Re: Second Antidumping Duty Administrative Review of Certain Frozen Warmwater Shrimp from Thailand (2006-2007): Respondent Selection (July 30, 2007), P.R. 228 ("July 30, 2007 Letter"), at 1–6. Ad Hoc asked Commerce to "revisit its mandatory respondent selection in this review and make that decision consistent with its respondent selection decisions in the other five

---

[3] Pakfood was defined in the administrative proceedings as including all but one of these entities. See Preliminary Results, 73 Fed. Reg. at 12,088.

concurrent certain frozen warmwater shrimp reviews by selecting no more than two mandatory respondents here." Id. at 6; see Letter from Bradford L. Ward, Dewey Ballantine LLP, to the Honorable Carlos M. Gutierrez, Secretary of Commerce, U.S. Department of Commerce, Re: Second Antidumping Duty Administrative Review of Certain Frozen Warmwater Shrimp from Thailand (2006-2007): Respondent Selection (August 10, 2007), P.R. 245 ("August 10, 2007 Letter"), at 9.

Commerce in August 2007 addressed Ad Hoc's objection to the Respondent Selection Memo. Letter from Gary Taverman, Acting Deputy Assistant Secretary for Import Administration, U.S. Department of Commerce, to Bradford Ward, Dewey Ballantine LLP, Re: 2006-2007 Administrative Review of the Antidumping Duty Order on Certain Frozen Warmwater Shrimp from Thailand (August 17, 2007), P.R. 249.  Commerce informed Ad Hoc "that it is not appropriate to reconsider the number of companies required to respond to the full questionnaire." Id. at 1.  Commerce explained as follows:

> [W]e evaluated our existing administrative resources and concluded that we have sufficient resources to examine four Thai exporters.  The Department afforded all parties an opportunity to comment on the issue of respondent selection prior to issuing a decision on his topic. . . .  With regard to your request that the Department disclose its rationale for selecting four respondents in this proceeding and only two companies in four of the five companion proceedings, we note that . . . we did not make our respondent selection decisions in isolation.

Id. at 1–2.

Commerce received questionnaire responses from the mandatory respondents in August, September, and October 2007. Preliminary Results, 73 Fed. Reg. at 12,089.  Commerce thereafter sent supplemental questionnaires to these respondents and received supplemental responses in late 2007 through early 2008. Id.  Commerce conducted a verification of the Thai

Union sales and costs in January and February 2008. Id.  Commerce in March 2008 rendered its preliminary findings for the administrative review of the subject antidumping duty order. Id. at 12,088.

## B
## Preliminary AFA Application To Certain Thai Union Sales

Commerce preliminarily decided to apply the adverse facts available ("AFA") rate to certain Thai Union sales pursuant to 19 U.S.C. § 1677e(a) and (b). Id. at 12,092–93.  Commerce explained its preliminary finding that:

> Thai Union had failed to report certain U.S. sales transactions during the POR, which should have been included in the company's U.S. sales database . . . .
>
> [T]he Department may use an adverse inference if "an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information . . . ."  Because (1) Thai Union had the necessary information within its control and it did not report this information; and (2) it failed to put forth its maximum effort as required by the Department's questionnaire, we find that Thai Union's failure to respond in this case clearly meets these standards.

Id. (quoting 19 U.S.C. § 1677e(b)).

Commerce preliminarily decided to apply AFA to three types of Thai Union sales, including certain export price ("EP") sales and certain direct constructed export price ("CEP") sales.[4] Id.  EP sales are those for export to the United States between a foreign producer/exporter and an unaffiliated purchaser before the date of exportation. See U.S. Department of Commerce, Antidumping Manual, Glossary of Terms (October 13, 2009).

---

[4] Commerce also preliminarily decided to apply adverse facts available AFA to a "small quantity of overlooked U.S. transactions which had not been included in error" by Thai Union. Preliminary Results, 73 Fed. Reg. at 12,092.  Although Commerce ultimately applied facts available and not AFA to those sales, Ad Hoc does not challenge this aspect of the proceedings. See Brief of Thai Union Frozen Products Public Co., Ltd. in Opposition to Plaintiff's Motion for Judgment on the Agency Record under Rule 56.2 ("Thai Union's Opposition") at 13 n.11; Ad Hoc Complaint.

CEP sales are those for export to the United States by a foreign producer/exporter to an affiliated U.S. company that sells the merchandise to an unaffiliated entity, and can occur before or after importation. See id.  Commerce treats as CEP sales those between a foreign producer's U.S. affiliate and an unrelated U.S. customer where the foreign producer ships directly to the U.S. customer ("direct CEP sales"). See, e.g., Certain Cut-to-Length Carbon Steel Plate From Romania: Preliminary Results of the Antidumping Duty Administrative Review and Partial Rescission, 70 Fed. Reg. 53,333, 53,335 (September 8, 2005) (using the term "back-to-back CEP sales").

Thai Union thereafter contested the application of AFA to its direct CEP sales. Letter from Phyllis Derrick, Akin Gump Strauss Hauer & Feld LLP, to the Honorable Carlos M. Gutierrez, Secretary of Commerce, U.S. Department of Commerce, Re: Second Administrative Review of Certain Frozen Warmwater Shrimp from Thailand (March 17, 2008), P.R. 428 ("March 17, 2008 Letter").  Thai Union argued that it had reported its direct CEP sales in accordance with both the questionnaire instructions and the longstanding methodology of Commerce. Id. at 4–12.

On April 15, 2008, Commerce responded to Thai Union. Letter from James Maeder, Director, Office 2, Office of AD/CVD Operations, U.S. Department of Commerce, to Warren Connelly, Akin Gump Strauss Hauer & Feld, Re: Preliminary Margin for Thai Union in the 2006-2007 Administrative Review of the Antidumping Order on Certain Frozen Warmwater Shrimp from Thailand (April 15, 2008), P.R. 454 ("April 15, 2008 Letter").  This letter "acknowledge[s] that the Department issued contradictory instructions with regard to the reporting requirements for these sales, which

may have led to confusion on the part of Thai Union." Id.  Commerce explained it was

reevaluating its preliminary decision to apply AFA to the subject direct CEP sales. Id.

Ad Hoc promptly objected to the April 15, 2008 Letter. Letter from Bradford L. Ward,

Dewey & LeBoeuf, to the Honorable Carlos M. Gutierrez, Secretary of Commerce, U.S.

Department of Commerce, Re: Second Antidumping Duty Administrative Review of Certain

Frozen Warmwater Shrimp from Thailand (2006-2007) (April 18, 2008), P.R. 459.  In response,

Ad Hoc was informed that Commerce neither "issue[d] revised preliminary results in the April

15, 2008, letter to Thai Union, nor . . . inten[ded] to issue revised preliminary results with respect

to . . . any Thai respondent." Letter from Irene Darzenta Tzafolias, Acting Director, Office 2,

AD/CVD Operations, U.S. Department of Commerce, to Bradford Ward, Dewey & LeBoeuf

LLP, Re: Letter to Thai Union Frozen Products Co., Ltd./Thai Union Seafood Co., Ltd. in the

2006-2007 Administrative Review of the Antidumping Duty Order on Certain Frozen

Warmwater Shrimp from Thailand (April 23, 2008), P.R. 464 ("April 23, 2008 Letter"), at 1.

Commerce further created a separate briefing schedule for the parties to submit arguments

"regarding the April 15 letter." Id. at 1–2.

Commerce thereafter reviewed the numerous administrative case briefs submitted by

interested parties relating to both the proceedings generally and the April 15, 2008 Letter

specifically. See, e.g., Case Brief on Behalf of the Ad Hoc Shrimp Trade Action Committee,

Case No. A-549-822, U.S. Department of Commerce, International Trade Administration, Import

Administration (April 14, 2008), P.R. 445 ("Ad Hoc Case Brief"); Supplemental Rebuttal Brief

on Behalf of the Ad Hoc Shrimp Trade Action Committee, Case No. A-549-822, U.S.

Department of Commerce, International Trade Administration, Import Administration (May 15,

2008) P.R. 483 ("Ad Hoc Supplemental Rebuttal Case Brief"); Administrative Case Brief of

Thai Union Frozen Products Public Co., Ltd. and Thai Union Seafood Co., Ltd., Case No. A-

549-822, U.S. Department of Commerce, International Trade Administration, Import

Administration (April 22, 2008), P.R. 463 ("Thai Union Case Brief").

**C**
**The Final Results And This Litigation**

In August 2008, Commerce rendered its final determination for the administrative review

of the subject antidumping duty order. Final Results, 73 Fed. Reg. 50,933.  Commerce calculated

the following dumping percentage margins: 2.44 for Pakfood, 3.77 for the Rubicon Group, 3.09

for Thai I-Mei, and 2.85 for Thai Union. Id. at 50,937–38.  The remaining companies subject to

the order received either the weighted-average dumping margin of 3.18 percent, id. at 50,937–38

n.6, or the AFA rate of 57.64 percent, id. at 50,935–38.  Commerce in the Final Results reversed

its preliminary decision by not applying AFA to Thai Union sales. Id. at 50,936–37.

With respect to the Thai Union EP sales in question, Commerce opted to apply facts

available pursuant to 19 U.S.C. § 1677e(a) and not AFA. Memorandum from Stephen J. Claeys,

Deputy Assistant for Import Administration, to David M. Spooner, Assistant Secretary for

Import Administration, Re: Issues and Decision Memorandum for the Antidumping Duty

Administrative Review on Certain Frozen Warmwater Shrimp from Thailand – February 1,

2006, through January 31, 2007, P.R. 512, appended to Final Results ("Decision Memo"), cmt.

14 at 41–43.  Commerce did so based on the unreported EP sales comprising "a very small

quantity of the total reported U.S. sales" and Thai Union having voluntarily disclosed them at the

outset of verification with a reasonable explanation. Id., cmt. 14 at 43.  Commerce likewise

declined to apply AFA to the direct CEP sales in question.  Commerce did so based on its

10

reporting instructions having "led to confusion on the part of Thai Union." Id., cmt. 13 at 40. However, rather than apply facts available, Commerce accepted the exclusion of these direct CEP sales from the dataset for the subject POR as reported by Thai Union. See id.

The Final Results involved numerous issues beyond the application of AFA to Thai Union. See Decision Memo.  In calculating final dumping margins, Commerce treated "warehousing expenses incurred after the subject merchandise leaves the production facility to be movement expenses . . . and deducted them from CEP for purposes of the final results." Id., cmt. 2 at 9.  The Final Results included in the Thai I-Mei dataset a single CEP sale "which entered the United States during the current POR, but which had a sale date . . . falling within the prior POR." Id., cmt. 12 at 32. Commerce determined that the Rubicon Group was not entitled to a CEP offset. Id., cmt. 5 at 12–17.

Ad Hoc initiated this litigation in September 2008. Ad Hoc Complaint.  Ad Hoc contested the following Commerce actions in the process that led to the Final Results:

- aspects of the respondent selection, id. ¶¶ 10–20;

- warehousing expenses being treated as movement expenses, id. ¶¶ 22–24;

- issuance of the April 15, 2008 Letter, id. ¶¶ 26–29;

- alleged failure to respond to a request to disclose ex parte contacts, id. ¶¶ 31–33;

- calculation of dumping margins, id. ¶¶ 35–37;

- AFA not being applied to certain Thai Union sales, id. ¶¶ 39–43; and

- inclusion of one Thai I-Mei sale in the U.S. market dataset, id. ¶¶ 45–47.

The Rubicon Group separately initiated litigation challenging the refusal of

Commerce to grant a CEP offset. See The Rubicon Group Complaint ¶ 6. This court in

March 2009 granted Defendant's motion to consolidate these cases because they both

challenged the Final Results. March 17, 2009 Order at 2–3, 5. In May 2009, Ad Hoc and

the Rubicon Group filed motions pursuant to USCIT R. 56.2. Motion of Plaintiff Ad Hoc

Shrimp Trade Action Committee for Judgment on the Agency Record Under Rule 56.2

("Ad Hoc's Motion"); USCIT R.56.2 Motion for Judgment Upon an Agency Record on

Behalf of Plaintiff The Rubicon Group ("The Rubicon Group's Motion").

     Defendant opposes every Ad Hoc challenge. Defendant's Response to Plaintiffs'

Motions for Judgment Upon the Agency Record ("Defendant's Response") at 11–27.

Defendant seeks a remand of the Rubicon Group CEP offset issue for Commerce to

reconsider its decision. Id. at 27–28. Thai Union, Pakfood and the Rubicon Group each

oppose Ad Hoc's Motion. Brief of Thai Union Frozen Products Public Co., Ltd. in

Opposition to Plaintiff's Motion for Judgment on the Agency Record Under Rule 56.2

("Thai Union's Opposition"); Defendant-Intervenors' Memorandum in Opposition to

Plaintiff's Motion for Judgment Upon the Agency Record ("Pakfood's Opposition"); The

Rubicon Group's Memorandum in Opposition to the Ad Hoc Shrimp Trade Action

Committee's Motion for Judgment Upon the Agency Record ("The Rubicon Group's

Opposition").

### III
### STANDARD OF REVIEW

     This court will uphold an administrative antidumping determination unless it is

"unsupported by substantial evidence on the record, or otherwise not in accordance with law."

SKF USA, Inc. v. INA Walzlager Schaeffler KG, 180 F.3d 1370, 1374 (Fed. Cir. 1999) (quoting

19 U.S.C. § 1516a(b)(1)(B)(i)). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Aimcor v. United States, 154 F.3d 1375, 1378 (Fed. Cir. 1998) (quoting Matsushita Elec. Indus. Co. v. United States, 750 F.2d 927, 933 (Fed. Cir. 1984)). "[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620, 86 S. Ct. 1018, 16 L. Ed. 2d 131 (1966).

This inquiry must consider "the record as a whole, including evidence that supports as well as evidence that 'fairly detracts from the substantiality of the evidence.'" Huaiyin Foreign Trade Corp. (30) v. United States, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting Atl. Sugar, Ltd. v. United States, 744 F.2d 1556, 1562 (Fed. Cir. 1984)). While contradictory evidence is considered, "the substantial evidence test does not require that there be an absence of evidence detracting from the agency's conclusion, nor is there an absence of substantial evidence simply because the reviewing court would have reached a different conclusion based on the same record." Cleo Inc. v. United States, 501 F.3d 1291, 1296 (Fed. Cir. 2007) (citing Universal Camera Corp. v. NLRB, 340 U.S. 474, 487–88, 71 S. Ct. 456, 95 L. Ed. 456 (1951)).

Commerce's statutory interpretation is reviewed using a two step analysis, first examining "whether Congress has directly spoken to the precise question at issue." Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984). If so, courts must then "give effect to the unambiguously expressed intent of Congress." Household Credit Servs. v. Pfennig, 541 U.S. 232, 239, 124 S. Ct. 1741, 158 L. Ed. 2d 450 (2004) (citing Chevron, 467 U.S. at 842–43). If instead Congress has left a "gap" for

Commerce to fill, the agency's regulation is "given controlling weight unless [it is] arbitrary, capricious, or manifestly contrary to the statute." <u>Chevron</u>, 467 U.S. at 843–44; <u>Household Credit</u>, 541 U.S. at 239.

Courts afford "great deference to the interpretation given the statute by the officers or agency charged with its administration." <u>Udall v. Tallman</u>, 380 U.S. 1, 16, 85 S. Ct. 792, 13 L. Ed. 2d 616 (1965).  The agency's construction need not be the only reasonable one or the result the court would have reached had the question first arisen in a judicial proceeding. <u>Id.</u> (citing <u>Unemployment Comp. Comm'n of Ala. v. Aragon</u>, 329 U.S. 143, 153, 67 S. Ct. 245, 91 L. Ed. 136 (1946)).  Courts are not to "weigh the wisdom of, or to resolve any struggle between, competing views of the policy interest, but rather to respect legitimate policy choices made by the agency in interpreting and applying the statute." <u>Suramerica de Aleaciones Laminadas, C.A. v. United States</u>, 966 F.2d 660, 665 (Fed. Cir. 1992) (citing <u>Chevron</u>, 467 U.S. at 866).

## IV
## DISCUSSION

### A
### <u>Commerce Properly Selected The Mandatory Respondents</u>

#### 1
#### Commerce Lawfully Selected Four Mandatory Respondents By Largest Volume

Commerce is provided with options for selecting respondents in an antidumping review. 19 U.S.C. § 1677f-1(c).  The statute provides as follows:

> Determination of dumping margin.
> (1) General rule.  In determining weighted average dumping margins . . . , the administering authority shall determine the individual weighted average dumping margin for each known exporter and producer of the subject merchandise.
> (2) Exception.  If it is not practicable to make individual weighted average dumping margin determinations under paragraph (1) because of the large number

of exporters or producers involved in the investigation or review, the
administering authority may determine the weighted average dumping margins
for a reasonable number of exporters or producers by limiting its examination
to—

     (A) a sample of exporters, producers, or types of products that is
statistically valid based on the information available to the administering
authority at the time of selection, or

     (B) exporters and producers accounting for the largest volume of the
subject merchandise from the exporting country that can be reasonably examined.

Id.  Ad Hoc recognizes that "the statute affords the agency with discretion to select respondents."

Ad Hoc's Motion at 21.

     After announcing its intent to select respondents by volume, Initiation Notice, 72 Fed.

Reg. at 17,110, and receiving an objection from Ad Hoc, May 22, 2007 Letter at 2–4, Commerce

invited interested parties to comment on this aspect of the proceeding, June 6, 2007 Letter at 1.

In response to the submissions received, Commerce rendered a reasoned analysis setting forth

the arguments of interested parties and documenting its rationale for selecting the four

respondents by largest volume. See Respondent Selection Memo.  Commerce concluded as

follows:

     Given the large number of companies requested for review . . . , the Department's
limited resources, and our statutory discretion . . . , the Department stated in the
Initiation Notice that it intended to select respondents based on our most common
method of selecting respondents with the largest volume.  This statement of intent
comports with the Department's normal practice but did not preclude any party
from submitting comments on the respondent selection methodology following
initiation.  While the Department acknowledges that sampling has been used in
rare cases to select respondents, the sampling methodology is the exception to the
Department's normal practice.  In addition, selecting respondents using the
sampling methodology requires intensive data collection and comments from all
parties which would not support an expeditious process of selecting respondents
in this administrative review.  Therefore, as our statutory discretion allows the
Department to choose respondents from either largest volume of imports or
sampling, the Department reasonably chose largest volume as the appropriate

methodology for selecting respondents in this administrative review.[5]

Id. at 6.

Commerce's respondent selection here is supported by substantial evidence and in accordance with law.  The 136 companies for which review was requested,[6] Respondent Selection Memo at 1, constitute a sufficiently "large number of exporters or producers" to enable selection by volume. 19 U.S.C. § 1677f-1(c)(2).  Commerce's documented explanation for not employing sampling, Respondent Selection Memo at 3–4, 6–7, comprises "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," Aimcor, 154 F.3d at 1378 (quoting Matsushita, 750 F.2d at 933).  Commerce here appropriately chose four respondents "in light of the general principle that agencies with statutory enforcement responsibilities enjoy broad discretion in allocating investigative and enforcement resources." Torrington Co. v. United States, 68 F.3d 1347, 1351 (Fed. Cir. 1995) (citing Heckler v. Cheney, 470 U.S. 821, 831, 105 S. Ct. 1649, 84 L. Ed. 2d 714 (1985)).[7]

---

[5] Ad Hoc claims that the statement about Commerce comporting with its practice is "patently false." Ad Hoc's Motion at 13.  To support its position, Ad Hoc cites the initiation notices of previous reviews of antidumping duty orders on warmwater shrimp that announced Commerce's intent to select respondents either through sampling or the largest by volume. Id. at 13–14 (citations omitted).  Ad Hoc further explains that "from April 2006 to April 2007, Commerce initiated at least 110 antidumping administrative reviews unrelated to the shrimp antidumping orders" and did not announce an intent to select respondents based on volume in any of them. Id. at 14 (citations omitted).  However, Pakfood is correct that more likely "Commerce meant only that its practice of 'selecting respondents with the largest volume' comported with the Department's normal practice, which is patently true." Pakfood's Opposition at 14 (emphasis removed).  Commerce was not required to explain this statement since, inter alia, Ad Hoc did not seek clarification in its case brief. See infra Section IV.A.2.

[6] Requests for review were withdrawn for six of the 142 companies for which review was initially sought. Respondent Selection Memo at 1.

[7] Ad Hoc emphasizes that: Commerce selected twice as many respondents as in similar reviews while basing its methodology on a reduction of staff, Ad Hoc's Motion at 17–18 (citing Respondent Selection Memo at 4), 20–21; and despite the increase, "the majority of the subject merchandise . . . was not subject to the proceeding." Id. at 18–19 (citations omitted).  However, Commerce here properly acted within its discretion to allocate resources by selecting four respondents. See Torrington, 68 F.3d at 1351.  Moreover, because Ad Hoc did not raise the issue in its case brief, Commerce was not required to clarify its selection of four respondents. See infra Section IV.A.2.

**2**
**Ad Hoc Did Not Exhaust Its Remedies To Challenge The Respondent Selection**

Ad Hoc challenges two aspects of the respondent selection process in the underlying review.  Specifically, Ad Hoc alleges that Commerce unlawfully: (1) failed to explain its statement of intent to select respondents by volume in the <u>Initiation Notice</u>, Ad Hoc Complaint ¶¶ 11–13; and (2) selected four respondents, <u>id.</u> ¶ 20.  Defendant and Pakfood counter that these claims are barred by the doctrine of exhaustion of administrative remedies. Defendant's Response at 11–13; Pakfood's Opposition at 11–17.

The exhaustion doctrine holds "that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." <u>Consol. Bearings Co. v. United States</u>, 348 F.3d 997, 1003 (Fed. Cir. 2003) (quoting <u>McKart v. United States</u>, 395 U.S. 185, 193, 89 S. Ct. 1657, 23 L. Ed. 2d 194 (1969)).  If a party does not exhaust available administrative remedies, "judicial review of administrative action is inappropriate." <u>Sharp Corp. v. United States</u>, 837 F.2d 1058, 1062 (Fed. Cir. 1988).  This "court generally takes a strict view of the need to exhaust remedies by raising all arguments."[8] <u>Pohang Iron & Steel Co. v. United States</u>, 23 CIT 778, 792 (1999). "In the antidumping context, Congress has prescribed a clear, step-by-step process for a claimant to follow, and the failure to do so precludes it from obtaining review of that issue in the Court of International Trade." <u>JCM, Ltd. v. United States</u>, 210 F.3d 1357, 1359 (Fed. Cir. 2000) (citations omitted).  It is "appropriate" for litigants

---

[8] This court recognizes limited exceptions to the requirement that litigants must have exhausted their administrative remedies. <u>See</u> <u>Budd Co., Wheel & Brake Div. v. United States</u>, 15 CIT 446, 452 n.2, 773 F. Supp 1549 (1991).  Ad Hoc contends that it fully exhausted its administrative remedies regarding respondent selection. Reply Brief of Plaintiff Ad Hoc ("Ad Hoc's Reply") at 2–4.  Therefore, Pakfood's argument concerning the inapplicability of the futility exception to the exhaustion doctrine need not be considered. <u>See</u> Pakfood's Opposition at 15–16.

challenging antidumping actions to have exhausted their administrative remedies by including all arguments in their case briefs submitted to Commerce. <u>See</u> 28 U.S.C. § 2637(d); 19 C.F.R. § 351.309(c)(2) ("The case brief must present all arguments that continue in the submitter's view to be relevant to the . . . final results, including any arguments presented before the . . . preliminary results.").

Ad Hoc did not object to any aspect of the respondent selection process in its case brief submitted to Commerce. <u>See</u> Ad Hoc Case Brief.  Prior to the <u>Preliminary Results</u>, Ad Hoc objected to both the <u>Initiation Notice</u> intent to select by volume, <u>May 22, 2007 Letter</u>, <u>June 13, 2007 Letter</u>, and the selection of four respondents, <u>July 30, 2007 Letter</u>, <u>August 10, 2007 Letter</u>. Ad Hoc now contends that Commerce failed to adequately explain these aspects of the respondent selection process. Ad Hoc's Motion at 16, 20.  However, Pakfood is correct that "to allow Commerce the opportunity to clarify any ambiguity in its explanation of its decision-making process, Ad Hoc should have raised this issue in its brief before the agency and argued its position then." Pakfood's Opposition at 15.  Given the regulatory requirement that "all arguments" be set forth in the case brief, Commerce could reasonably have concluded that Ad Hoc was no longer pursuing its respondent selection challenge. <u>See</u> 19 C.F.R. § 351.309(c)(2).

The failure to include an "argument in a case brief is a failure to exhaust administrative remedies with respect to that argument because it 'deprives [Commerce] of an opportunity to consider the matter, make its ruling, and state the reasons for its action.'" <u>Ad Hoc Shrimp Trade Action Comm. v. United States</u>, 616 F. Supp. 2d 1354, 1366 (2009) (quoting <u>Unemployment Comp. Comm'n</u>, 329 U.S. at 155).  Raising an issue before Commerce in advance of case brief submission does not dispense with the requirement for case brief inclusion. <u>See Carpenter Tech.</u>

Corp. v. United States, 30 CIT 1595, 1597–98, 464 F. Supp. 2d 1347 (2006).  In Carpenter, this

court reasoned as follows:

> Although Plaintiff advocated against [the contested issue of] collapsing in its two
> submissions prior to the preliminary results, Commerce concluded otherwise.  At
> that point, if Plaintiff believed that the collapsing issue was relevant to the Final
> Results, Plaintiff needed to include that issue in its case brief, as required by
> regulation.  Commerce would then have known that Plaintiff had not waived the
> issue.

Id. at 1598.

Ad Hoc's claims based on the respondent selection process are likewise barred.

Its failure to present the arguments in its case brief equates with a failure to exhaust

administrative remedies.  See Ta Chen Stainless Steel Pipe, Ltd. v. United States, 28 CIT

627, 643–45, 342 F. Supp. 2d 1191 (2004).  That these objections were previously

communicated to Commerce does not circumvent the exhaustion requirement.  See

Carpenter, 30 CIT at 1597–98.  This applies to both the Initiation Notice intent to select

respondents by volume,[9] see Ad Hoc Case Brief, May 22, 2007 Letter, June 13, 2007

Letter, as well as the number of companies selected,[10] see Ad Hoc Case Brief, July 30,

---

[9] In addition to the exhaustion doctrine, parties present other bases to preclude consideration of Ad Hoc's
challenge to the statement of intent to select respondents. See The Rubicon Group's Opposition at 1 ("An intention
does not constitute a final agency action, and thus is not fit for judicial review."), 4 ("This argument should be
rejected for failure to state a claim upon which relief can be granted under USCIT R. 12(b)(5)."); Pakfood's
Opposition at 8 ("Ad Hoc's complaint was never ripe for review").  Although these arguments need not be addressed
because Ad Hoc failed to exhaust its administrative remedies, Pakfood is correct that it is "inappropriate for Ad Hoc
to challenge that initial announcement now when Commerce already made a separate, final, superceding respondent
selection methodology decision, which Ad Hoc has chosen not to challenge." Pakfood's Opposition at 10 (emphasis
removed).

[10] Ad Hoc calls the selection of four respondents "troubling" for facilitating the participation of Thai I-Mei.
Ad Hoc's Motion at 19. Although Commerce was not required to clarify its selection of Thai I-Mei because Ad Hoc
did not raise this issue in its case brief, the record does contain support for Thai I-Mei being chosen. See Letter from
Steptoe & Johnson LLP, to the Honorable Carlos M. Gutierrez, U.S. Department of Commerce, Re: Certain Frozen
Warmwater Shrimp From Thailand: Response to Domestic Producers' Comments Regarding Respondent Selection
(August 8, 2007), P.R. 240.

2007 Letter, August 10, 2007 Letter.  Commerce did set a timeframe for comments on the

selection process to maintain a schedule for sending questionnaires to respondents. See

June 6, 2007 Letter.  However, Ad Hoc remained able to challenge the respondent

selection process in its case brief. See Carpenter, 30 CIT at 1598.  By neglecting to do so,

Ad Hoc failed to exhaust its administrative remedies.

### B
### Commerce Properly Treated Warehousing Expenses As Moving Expenses

Ad Hoc challenges the classification by Commerce of post-importation U.S. warehousing

expenses incurred with respect to CEP sales as moving expenses as opposed to direct selling

expenses. Ad Hoc's Motion at 21–24.  Commerce is required to reduce "the price used to

establish" EP and CEP by "the amount" of any "expenses . . . which are incident to bringing the

subject merchandise from the original place of shipment in the exporting country to the place of

delivery in the United States." 19 U.S.C. § 1677a(c)(2)(A).  Although the statute does not

address warehousing expenses, its legislative history explains that the reduction is to "account

for: . . . transportation and other expenses, including warehousing expenses." Uruguay Round

Agreements Act Statement of Administrative Action, H.R. Doc. 103-316 ("SAA"),[11] reprinted in

1994 U.S.C.C.A.N. 4040, 4163.  The implementing regulation provides as follows: "The

Secretary will consider warehousing expenses that are incurred after the subject merchandise . . .

leaves the original place of shipment as movement expenses." 19 C.F.R. § 351.401(e)(2).

---

[11] The Uruguay Round Agreements Act was signed into law on December 8, 1994.  The Act approved the new WTO Agreement, and the agreements annexed thereto, "resulting from the Uruguay Round of multilateral trade negotiations [conducted] under the auspices of the General Agreement on Tariffs and Trade." 19 U.S.C. § 3511(a)(1).  The Statement of Administrative Action approved by Congress to implement the Agreements is regarded as "an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and [the Uruguay Round Agreements] Act in any judicial proceeding in which a question arises concerning such interpretation or application." 19 U.S.C. § 3512(d).

Ad Hoc presented Commerce with three arguments to classify warehousing

expenses as direct selling expenses. Ad Hoc Case Brief at 2–3.  Ad Hoc first contended

that it would be inconsistent to treat inventory carrying costs as direct selling expenses

but warehousing costs as moving expenses. Id. at 2–3.  Commerce gave the following

explanation:

> Inventory carrying costs are not actual expenses borne by the respondent, but
> rather they are imputed financing costs associated with holding inventory for a
> period prior to its sale.  By their nature, financing expenses are not associated
> with the movement of merchandise, and thus the regulations do not direct the
> Department to treat them as movement expenses.  In contrast, the regulations
> explicitly instruct the Department to treat warehousing expenses incurred after the
> merchandise leaves the factory as movement expenses.

Decision Memo., cmt. 2 at 9.

Ad Hoc next claimed that for certain CEP sales, "title passes to the unaffiliated

customer at the warehouse location." Ad Hoc Case Brief at 3.  Commerce did not

consider this to be relevant because the expenses at issue were "associated with storing

subject merchandise prior to sale." Decision Memo, cmt. 2 at 9.  Lastly, Ad Hoc relied

upon the respondents having characterized inventory maintenance expenses as selling

expenses "in their sales activity charts." Ad Hoc Case Brief at 3.  Commerce explained

that this position was "misplaced" given the limited function of the sales activity chart

and distinguished inventory maintenance from physical warehousing. Decision Memo,

cmt. 2 at 10.

Commerce here properly classified warehousing expenses in compliance with its

regulation that advances legislative intent and does not conflict with the statute.[12] See 19

C.F.R. § 351.401(e)(2); Chevron, 467 U.S. at 843–44; SAA, 1994 U.S.C.C.A.N. at 4163.

In response to Ad Hoc, Commerce conducted analyses that distinguished inventory

carrying costs, disputed the relevance of title passing, and rejected reliance on respondent

sales activity charts. Decision Memo, cmt. 2 at 7–10.  With these principled bases

documented in the record, see id., the challenged expense classification is supported by

"such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion," Aimcor, 154 F.3d at 1378 (quoting Matsushita, 750 F.2d at 933).

**C**
**Commerce Properly Declined To Apply AFA To Thai Union Sales**

**1**
**Statutory Overview**

Commerce is permitted in certain circumstances to render determinations using facts

available or AFA. 19 U.S.C. § 1677e.  The statute provides in relevant part as follows:

(a) In general.  If—
　(1) necessary information is not available on the record, or
　(2) an interested party or any other person—
　　(A) withholds information that has been requested by the administering
　　authority . . . under this title,
　　(B) fails to provide such information by the deadlines for submission of the
　　information . . . ,
　　(C) significantly impedes a proceeding . . . , or
　　(D) provides such information but the information cannot be verified . . . , the
　　administering authority . . . shall . . . use the facts otherwise available in reaching

---

[12] Ad Hoc misplaces reliance on the definition of direct selling expenses as those "that result from, and bear a direct relationship to, the particular sale in question." See Ad Hoc's Motion at 21 (citing 19 C.F.R. § 351.410(c)). As accurately explained by the Rubicon Group: "Because post-importation U.S. warehousing expenses are more specifically provided for as movement expenses . . . , [Commerce] reasonably did not treat them as direct selling expenses. . . . [Ad Hoc] appears to assume that, in a [CEP] context, only expenses incident to the transportation of the merchandise to the U.S. affiliated reseller – as opposed to the first unaffiliated U.S. customer – constitute movement expenses, but neither the statute nor the regulation contains any such limitation." The Rubicon Group's Opposition at 9, 10.

the applicable determination . . . .

(b) Adverse inferences.  If the administering authority . . . finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information from the administering authority . . . , the administering authority . . . , in reaching the applicable determination under this title, may use an inference that is adverse to the interests of that party in selecting among the facts otherwise available.

Id.

Clarification of 19 U.S.C. § 1677e is set forth in <u>Nippon Steel Corp. v. United States</u>, 337 F.3d 1373 (Fed. Cir. 2003).  There, the Federal Circuit explained that "[t]he statute has two distinct parts respectively addressing two distinct circumstances under which Commerce has received less than the full and complete facts needed to make a determination." <u>Id.</u> at 1381.  The "facts available" part focuses on the "respondent's failure to provide information.  The reason for the failure is of no moment." <u>Id.</u> (emphasis removed).  By contrast, the AFA part focuses on the

respondent's failure to cooperate to the best of its ability, not its failure to provide requested information. . . .  To conclude that an importer has not cooperated to the best of its ability and to draw an adverse inference under section 1677e(b), Commerce need only make two showings.  First, it must make an objective showing that a reasonable and responsible importer would have known that the requested information was required to be kept and maintained under the applicable statutes, rules, and regulations.  Second, Commerce must then make a subjective showing that the respondent under investigation not only has failed to promptly produce the requested information, but further that the failure to fully respond is the result of the respondent's lack of cooperation in either: (a) failing to keep and maintain all required record, or (b) failing to put forth its maximum efforts to investigate and obtain the requested information from its records.  An adverse inference may not be drawn merely from a failure to respond, but only under circumstances in which it is reasonable for Commerce to expect that more forthcoming responses should have been made; i.e., under circumstances in which it is reasonable to conclude that less than full cooperation has been shown.  While intentional conduct, such as deliberate concealment or inaccurate reporting, surely evinces a failure to cooperate, the statute does not contain an intent element.  "Inadequate inquiries" may suffice.  The statutory trigger for Commerce's consideration of an adverse inference is simply a failure to cooperate to the best

of respondent's ability, regardless of motivation or intent.[13]

Id. at 1382–83 (citation omitted) (emphasis removed).

Commerce is by statute afforded discretion in applying facts available and AFA.

See 19 U.S.C. § 1677e(a), (b).  This discretion is predicated on "Commerce's special

expertise in administering the anti-dumping law [which] entitles its decisions to

deference from the courts." Nippon Steel, 337 F.3d at 1379.  Commerce "enjoys broad,

although not unlimited, discretion with regard to the proprietary use of facts available,"

NTN Corp. v. United States, 28 CIT 108, 117, 306 F. Supp. 2d 1319 (2004), as well as

"in the application of adverse facts available," AK Steel Corp. v. United States, 28 CIT

1408, 1417, 346 F. Supp. 2d 1348 (2004).

**2**
**Commerce Properly Declined To Apply AFA To Thai Union EP sales**

Commerce asked Thai Union to report U.S. sales during the POR, including EP sales.

March 17, 2008 Letter Ex. 1: Response of Thai Union to Section C of the Department's July 19,

2007 Questionnaire ("Thai Union Questionnaire Response") at C-2.  Because Thai Union did not

report [[ a small number of ]] EP sales, Thai Union's Opposition at 12, Commerce preliminarily

decided to apply AFA. Preliminary Results, 73 Fed. Reg. 12,092–93.  Thai Union explained that

the omission was inadvertent and "due to a coding error.  Specifically, Thai Union's sales ledger

incorrectly recorded the customer's name . . . , which in turn resulted in failure by the computer

program to select these transactions for the sales data file." Thai Union Case Brief at 52.

---

[13] Ad Hoc contends that Commerce may not permissibly inquire into the mens rea of a respondent. Ad Hoc's Motion at 32.  However, Thai Union is correct that "a respondent's intent is a permissible, but not a required, consideration in the AFA decision." Thai Union's Opposition at 23.  "The fact that a test is 'subjective' means that it can include consideration of a respondent's intentions and motivations." Id. citing Nippon Steel, 337 F.3d at 1383.

Commerce ultimately accepted this explanation and applied facts available as follows:

> Thai Union itself discovered that it had not reported these sales during its
> preparation for verification, and it informed the Department of its omission at the
> earliest possible opportunity (i.e., prior to starting verification of the relevant
> topic).  Moreover, Thai Union proffered a reasonable explanation as to why it had
> not reported these transactions (i.e., a computer error related to the miscoding of
> the customer name), and it was able to substantiate this explanation to our
> satisfaction at verification.  Further, based on extensive testing procedures
> performed at verification, we are confident that Thai Union identified the
> complete universe of unreported transactions that fell under this scenario.
>
> Therefore, we have reversed our preliminary decision to apply AFA to Thai
> Union's unreported EP sales because: 1) Thai Union voluntarily disclosed the
> unreported sales to the Department very early on at verification; 2) we find Thai
> Union's explanation regarding why it did not report these U.S. sales to be
> plausible; 3) these sales constitute a very small quantity of the total reported U.S.
> sales; and 4) the Department satisfied itself that it obtained the full universe of
> these transactions at verification.  Therefore we find it appropriate to use facts
> available without adverse inference for these transactions . . . .[14]

Decision Memo, cmt. 14 at 43 (citations omitted).

The record supports Commerce having concluded that Thai Union acted to the best of its

ability despite not reporting these EP sales initially.  See Decision Memo, cmt. 14 at 41–43; 19

U.S.C. § 1677e(b); Nippon Steel, 337 F.3d at 1379–83.  Thai Union's explanation and

Commerce's acceptance are both reasonable.[15]  See Thai Union Case Brief at 52–54; Decision

Memo. cmt. 14 at 41–44.  As Thai Union points out, this error involved only [[ a small number ]]

---

[14] Ad Hoc challenges Commerce's characterization of the subject EP sales as a "very small quantity." Ad
Hoc's Motion at 37.  However, Ad Hoc does not provide the total number of reported Thai Union U.S. sales
necessary to evaluate Commerce's characterization. See id.  Without such numerical support, this Ad Hoc argument
will not be considered because of the generally applicable maxim that de minimus non curat lex ("The law does not
concern itself with trifles."). See BLACK'S LAW DICTIONARY (9th Ed. 2009); Alcan Aluminum Corp. v. United
States, 165 F.3d 898, 902–03 (Fed. Cir. 1999) (citations omitted).

[15] Ad Hoc portrays Thai Union's explanation for not reporting the EP sales as contradicting its explanation
for not reporting certain direct CEP sales. Ad Hoc's Motion at 36.  However, as Thai Union accurately identifies,
"[t]he fatal defect in the Plaintiff's effort to point out a supposed inconsistency is that it wrongly asserts that Thai
Union miscoded as direct CEP sales the [subject] EP sales . . . .  The record does not contain any evidence that this
miscoding occurred." See Thai Union's Opposition at 31.

of the more than 12,000 separate sales transactions in its relevant databases. Thai Union's

Opposition at 3; see Decision Memo, cmt. 14 at 41.  That Thai Union caught and reported the

error itself supports the reasonableness of Commerce's decision to decline to apply AFA.[16] Cf.

Light-Walled Rectangular Pipe and Tube from Mexico: Notice of Final Determination of Sales

at Less Than Fair Value, 69 Fed. Reg. 53,677 (September 2, 2004), accompanying Issues and

Decision Memorandum cmt. 4 ("the information related to these sales was presented to the

Department as clerical error at the outset of verification and . . . constitutes a minor correction").

Commerce acted within its broad discretion under 19 U.S.C. § 1677e(a) by applying facts

available to the subject EP sales. See NTN, 28 CIT at 117.  Because Thai Union did not report

these sales, Commerce was able to use facts available. See 19 U.S.C. § 1677e(a)(2)(A); Nippon

Steel, 337 F.3d at 1382.  Application of facts available instead of AFA here is supported by

"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

Aimcor, 154 F.3d at 1378 (quoting Matsushita, 750 F.2d at 933).

**3**
**Commerce Properly Declined To Apply AFA To Thai Union Direct CEP Sales**

Ad Hoc advances a series of arguments based on the process through which Commerce

reversed its preliminary decision to apply AFA to certain Thai Union direct CEP sales. Ad Hoc's

Motion at 24–34.  Its challenges predicated on ex parte contacts and the April 15, 2008 Letter are

both legally insufficient. Infra Sections IV.C.3(b), (c).  As an analysis of the underlying

reporting instructions to Thai Union demonstrates, infra Section IV.C.3(a), Commerce's

---

[16] Ad Hoc argues that "Thai Union never actually reported the EP sales in question; . . . it only provided Commerce with the total volume of those sales." Ad Hoc's Motion at 35.  However, Commerce acted within its broad discretion under 19 U.S.C. § 1677e in finding that the self-reporting by volume warranted application of facts available and not AFA. See supra Section IV.C.1.

determination not to apply AFA to the subject direct CEP sales and its resultant margin

calculations are supported by substantial evidence and in accordance with law, <u>infra</u> Sections

IV.C.3(d), (e).

**(a)**
**Commerce's reporting instructions to Thai Union concerning CEP sales**

In the initial questionnaire, Commerce instructed Thai Union to "[r]eport each U.S. sale

of merchandise entered for consumption during the POR, except . . . for CEP sales made after

importation, report each transaction that has a date of sale within the POR." Thai Union

Questionnaire Response at C-2.  Thai Union reported [[ a large number of ]] direct CEP sales to

its largest U.S. customer that entered the United States during the POR. Thai Union's Opposition

at 6.  Thai Union did not report an additional [[ small number of ]] direct CEP sales to this

customer that were made during the POR but entered the United States after the POR. <u>Id.</u>

At issue is whether these direct CEP sales were required to be included as part of Thai

Union's reportable "universe." <u>Decision Memo</u>, cmt. 13 at 34.  Thai Union claims that they were

not because of the instruction that date of sale be used only for "CEP sales made after

importation" (<u>i.e.</u>, non-direct CEP sales). <u>See</u> Thai Union's Opposition at 7; Thai Union Case

Brief at 18–20.  Thai Union contends that Commerce has a longstanding and consistent practice

of requiring the reporting of only those direct CEP sales which enter the United States during the

POR. Thai Union's Opposition at 7–8; Thai Union Case Brief at 22–27 (citations omitted).

Commerce in October 2007 issued a supplemental questionnaire to Thai Union. Letter

from Shawn Thompson, Program Manager, AD/CVD Operations, Office 2, U.S. Department of

Commerce, to D. Michael Kaye, Akin Gump Strauss Hauer & Feld, Re: Antidumping Duty

Administrative Review: Certain Frozen Warmwater Shrimp from Thailand (October 31, 2007),

P.R. 315.  "For CEP sales," Thai Union was asked to "confirm that you have reported all sales during the POR, regardless of entry date." Id. at 10.  The response stated as follows: "For CEP sales made prior to importation, Thai Union has . . . reported all entries for consumption during the POR." March 17, 2008 Letter Ex. 2 at 34.  Thai Union characterizes this response as having "clearly explained that it had identified the universe of reportable direct CEP sales using the entry date, not the date of sale, based on its understanding of the required reporting universe." Thai Union's Opposition at 9.

Commerce in December 2007 issued a second supplemental questionnaire to Thai Union. Letter from Shawn Thompson, Program Manager, AD/CVD Operations, Office 2, U.S. Department of Commerce, to D. Michael Kaye, Akin Gump Strauss Hauer & Feld, Re: Antidumping Duty Administrative Review: Certain Frozen Warmwater Shrimp from Thailand (December 13, 2007), P.R. 357.  Commerce asked: "Did Thai Union have any CEP sales which were shipped directly to the unaffiliated U.S. customer . . . prior to the end of the POR?  If so, revise the U.S. sales listing to report them." Id. at 2.  Thai Union describes this as "[t]he first arguable, but still unclear, indication that the Department might have decided to implement a new type of reporting universe." Thai Union's Opposition at 10 (emphasis removed).

In response to the second supplemental questionnaire, Thai Union informed Commerce that it "has again reviewed its records to ensure that it has reported all direct CEP sales that entered during the POR." Response of Thai Union Frozen Products PCL and Thai Union Seafood Company Ltd. to the Department's December 13, 2007 Questionnaire, Volume 2 of 2, Supplemental Response: Sections A-C, P.R. 369, at 7.  Thai Union asserts that this reaction evidences its "continued understanding that it was required to report entries of direct CEP sales

during the second POR." Thai Union's Opposition at 12.  In early 2008, a Commerce official

informed Thai Union that "you should have reported the universe of direct CEP sales based on

date of sale . . . .  <u>I realize that the instruction in the original questionnaire was somewhat

misleading</u>.  However, our supplemental questionnaires requested that you do so, and . . . you

didn't follow our latest instruction." <u>March 17, 2008 Letter</u> Ex. 4: E-mail from Irina Itkin, U.S.

Department of Commerce, to Phyllis Derrick et al., Re: U.S. sales (January 11, 2008) (emphasis

added).

**(b)**

**Commerce properly disclosed its <u>ex parte</u> contacts with Thai Union**

On March 6, 2008, Commerce rendered its preliminary decision to apply AFA to the

subject Thai Union direct CEP sales. <u>Preliminary Results</u>, 73 Fed. Reg. at 12,092–93.  On March

12, 20, and 27, 2008, Commerce held <u>ex parte</u> meetings with Thai Union.[17] <u>See</u> Memorandum

from Irina Itkin, Senior Analyst, AD/CVD Operations, Office 2, U.S. Department of Commerce,

to the File, Re: Disclosure [of] Meeting with Thai Union Frozen Products PCL and Thai Union

Seafood Company, Ltd. in the 2006-2007 Antidumping Duty Administrative Review on Certain

Frozen Warmwater Shrimp from Thailand (March 20, 2008), P.R. 431 ("<u>March 12 Meeting

Memo</u>"); Memorandum from Irina Itkin, Senior Analyst, AD/CVD Operations, Office 2, U.S.

Department of Commerce, to the File, Re: Ex-Parte Meeting with Thai Union Frozen Products

PCL and Thai Union Seafood Company, Ltd. in the 2006-2007 Antidumping Duty

Administrative Review on Certain Frozen Warmwater Shrimp from Thailand (March 20, 2008),

---

[17] Throughout the administrative process, Commerce held <u>ex parte</u> meetings with parties other than Thai Union, including Ad Hoc. <u>See, e.g.</u>, Memorandum from Irene Darzenta Tzafolias, Acting Director, Office 2, AD/CVD Operations, U.S. Department of Commerce, to the File, Re: Ex-Parte Meeting with Petitioner's Counsel in the 2006-2007 Antidumping Duty Administrative Review on Certain Frozen Warmwater Shrimp from Thailand (April 10, 2008), P.R. 443.

P.R. 430 ("March 20 Meeting Memo"); Memorandum from James Maeder, Director, Office 2, AD/CVD Operations to the File, Re: 2006-2007 Administrative Review on Certain Frozen Warmwater Shrimp from Thailand: Ex-Parte Meeting with Thai Embassy Officials and Thai Union Officials, (March 28, 2008) P.R. 440 ("March 27 Meeting Memo").

Ad Hoc claims that Commerce failed to address its request that Commerce disclose all ex parte contacts. See Ad Hoc's Motion at 26–28. Commerce is required to document its ex parte meetings. See 19 U.S.C. § 1677f(a)(3); 19 C.F.R. § 351.104(a). Commerce here memorialized the discussion topics and individuals present at its three ex parte meetings with Thai Union in March 2008. See March 12 Meeting Memo; March 20 Meeting Memo; March 27 Meeting Memo. Ad Hoc in April 2008 stated that Commerce should "report all ex parte contacts between any Department employees and any parties . . . with regard to Thai Union." Letter from Bradford L. Ward, Dewey & LeBoef LLP, to the Honorable Carlos M. Gutierrez, Secretary of Commerce, U.S. Department of Commerce, Re: Antidumping Duty Administrative Review of Certain Frozen Warmwater Shrimp from Thailand: Thai Union (April 16, 2008), P.R. 455, at 9.

Commerce promptly responded to Ad Hoc. April 23, 2008 Letter. Commerce explained that, "with respect to your request that the Department document all ex parte communications between it and outside parties in this review, we note that the record is complete on the issue in question up to this point in time in that it contains all of the Department's ex parte memoranda as required by law." Id. at 2. Ad Hoc thereafter "reiterate[d] [its] request that the Department disclose all ex parte contacts, to the extent they have not all been disclosed, regarding or related to the application of AFA to Thai Union, so as to complete the administrative record in this proceeding." Ad Hoc Supplemental Rebuttal Case Brief at 25. Ad Hoc now contends that

Commerce unlawfully neglected to respond to this issue in the <u>Final Results</u>. Ad Hoc's Motion at 28.

Commerce acted properly concerning its <u>ex parte</u> contacts with Thai Union.  The documenting memoranda comply with legal requirements. <u>See</u> <u>March 12 Meeting Memo</u>; <u>March 20 Meeting Memo</u>; <u>March 27 Meeting Memo</u>; 19 U.S.C. § 1677f(a)(3); 19 C.F.R. § 351.104(a). Commerce was not obligated to revisit the matter in the <u>Final Results</u> given that Commerce had already disclosed all <u>ex parte</u> contacts and Ad Hoc qualified its final request with "to the extent they have not all been disclosed." Ad Hoc Supplemental Rebuttal Case Brief at 25; <u>see</u> Thai Union's Opposition at 37 (describing this claim as "a mere quibble because the Committee asked the question, and the Department answered it.").  Because all <u>ex parte</u> contacts between Commerce and Thai Union were properly communicated to Ad Hoc and memorialized in the administrative record,[18] Ad Hoc's argument predicated on these contacts is without merit.

### (c)
### Commerce properly issued the <u>April 15, 2008 Letter</u>

Ad Hoc challenges Commerce's issuance to Thai Union of the <u>April 15, 2008 Letter</u>. Ad Hoc's Motion at 24–26.  In that correspondence, Commerce references meetings with Thai Union and states as follows:

> [W]e have carefully reviewed the initial and supplemental questionnaires the Department issued to Thai Union in the context of this review, as well as Thai Union's responses to those questionnaires, with respect to the reporting requirements for direct CEP transactions.  Upon our review, we acknowledge that

---

[18] Ad Hoc claims that, "in the underlying review, the record does not support the conclusion that . . . all <u>ex parte</u> contacts had been recorded consistent with" legal requirements. Ad Hoc's Motion at 27.  However, Defendant accurately responds that Ad Hoc could "have sought supplementation" of the administrative record to document additional contacts. Defendant's Response at 21 (citing <u>Alloy Piping Prods. v. United States</u>, 26 CIT 330, 344, 201 F. Supp. 2d 1267, 1270 (2001), <u>aff'd</u> 334 F.3d 1284 (Fed. Cir. 2003)).  Ad Hoc reinforces that this available recourse was not pursued by replying that it "has not asked this Court to find that the administrative record is incomplete." Ad Hoc's Reply at 15.

the Department issued contradictory instructions with regard to the reporting requirements for these sales, which may have led to confusion on the part of Thai Union.  Therefore, we are reevaluating our preliminary decision to apply adverse facts available to these sales.  We will make a final determination regarding this issue no later than the date of the final results in this review.

April 15, 2008 Letter.  After receiving objections from Ad Hoc, Commerce set up a separate briefing schedule for "parties to submit affirmative arguments regarding the April 15 letter . . . and rebuttal comments." April 23, 2008 Letter at 1–2.

Ad Hoc argues that the April 15, 2008 "Letter clearly altered the agency's findings in the Preliminary Results, and did so without any legal authority." Ad Hoc's Motion at 25.  However, Commerce correctly explained that it "did not issue revised preliminary results in the April 15, 2008, letter . . . .  Instead, the Department merely stated that it would re-evaluate the issue for the final results, just as it will for every decision made in the preliminary results raised by the parties." April 23, 2008 Letter at 1. Ad Hoc's repeated contention that the April 15, 2008 Letter "amended the preliminary results" is incorrect.[19] See Reply Brief of Plaintiff Ad Hoc ("Ad Hoc's Reply")[20] at 10.

Ad Hoc next contends that the "letter short-circuited the agency's promulgated regulations regarding written argument." Ad Hoc's Motion at 26.  Those regulations set forth the process for submitting case briefs to Commerce but do not preclude additional, issue-specific briefing. See 19 C.F.R. § 351.309.  Indeed, Commerce is authorized to "request written argument

---

[19] Because the Preliminary Results were not amended, Commerce need not have referenced any ministerial error as Ad Hoc contends. See Ad Hoc's Motion at 25–26.  Moreover, Thai Union establishes that Commerce has "issue[d] revised Preliminary Results on several occasions that did not involve the mere correction of ministerial errors." Thai Union's Opposition at 34 (citations omitted).

on any issue from any person . . . at any time." Id. § 351.309(b)(2).  Commerce may supplement

the case brief submission process by providing parties with the opportunity to address a

particular issue, as it did here.[21]  Defendant is correct that "Commerce acted consistent with its

regulatory authority and communicated its intention to re-evaluate its determination."

Defendant's Response at 20.  Commerce therefore properly issued the April 15, 2008 Letter.[22]

**(d)**
**Commerce properly declined to apply AFA to Thai Union direct CEP sales**

Commerce reversed its preliminary decision concerning application of AFA to the

subject direct CEP sales. Final Results, 73 Fed. Reg. at 50,936.  It provided the following

rationale:

> [B]ecause the instructions issued by the Department in its original questionnaire
> differed from those issued in the supplemental questionnaires with respect to a
> key reporting issue[] (i.e., the appropriate universe of sales), and that difference
> appears to have led to confusion on the part of Thai Union, we find that it would
> be inappropriate to find that Thai Union did not cooperate to the best of its ability
> in this instance.  Accordingly, we have reconsidered our preliminary decision to
> apply facts available with an adverse inference to these unreported direct CEP
> sales and rather find that the acceptance of Thai Union's direct CEP sales listing,
> as submitted, is appropriate for purposes of these final results.

Decision Memo, cmt. 13 at 40.  Commerce therefore declined to apply either AFA or facts

---

[20] In its reply, Ad Hoc improperly uses footnotes unrelated to the text as a means to evade page limits. See Ad Hoc's Reply at 4–5 nn.2–3; Varda, Inc. v. Ins. Co. of N. Am., 45 F.3d 636, 640 (2d Cir. 1994) (citing Prod. & Maint. Employees' Local 504 v. Roadmaster Corp., 954 F.2d 1397, 1407 (7th Cir. 1992)).  Ad Hoc should have filed a motion to exceed the page limitation.

[21] Ad Hoc claims prejudice because the briefing schedule worked to the advantage of Thai Union. See Ad Hoc's Motion at 25. However, Thai Union accurately responds that "the Committee had the opportunity to submit arguments and did in fact submit arguments on numerous occasions concerning the correctness of the Department's preliminary determination to apply AFA to Thai Union's unreported CEP sales." Thai Union's Opposition at 35.

[22] Ad Hoc alleges that the April 15, 2008 Letter resulted from "an aggressive lobbying campaign by Thai Union attacking the Preliminary Results." Ad Hoc's Motion at 24.  However, Thai Union is correct that this claim is "unaccompanied by evidence. . . .  Plaintiff does not identify any aspect of Thai Union's advocacy of its position that was either unlawful or otherwise inappropriate." Thai Union's Opposition at 36.

available to the subject direct CEP sale, and instead accepted the direct CEP sales data as reported by Thai Union. Final Results, 73 Fed. Reg. at 50,936.

Commerce properly reached its conclusion that Thai Union had acted appropriately in reporting direct CEP sales. See Decision Memo, cmt. 13 at 38–41; 19 U.S.C. § 1677e(b); Nippon Steel, 337 F.3d at 1382–83. The questionnaires contain confusing and varied instructions. See supra Section IV.C.3(a). Thai Union's repeated response that it was using date of entry establishes a genuine misunderstanding concerning the reportable universe.[23] See id. As Thai Union states, "the Department reasonably concluded that Thai Union did not understand the Department's two sets of supplemental instructions in the same manner as the Department did. . . . [T]here was no evidence that Thai Union intentionally disregarded a known reporting obligation." Thai Union's Opposition at 21–22. The record contains ample bases for Commerce's conclusion, see Thai Union Case Brief at 3–52, including:

- Commerce in the same review directed Thai I-Mei to report direct CEP sales based on date of entry, id. at 20;

- Commerce in 11 previous reviews required respondents to report direct CEP sales based on date of entry, id. at 20–27 (citations omitted), and did not here undertake procedural steps to implement a change in practice, id. at 31–35;[24]

- "Thai Union had absolutely nothing to gain" by not reporting these sales that it would

---

[23] Although Thai Union and Commerce disagree as to the clarity of the supplemental questionnaire instructions when considered alongside the original instructions, this dispute need not be resolved "in order to find that Thai Union acted to the best of its ability." Thai Union's Opposition at 17 n.14.

[24] Given the different reporting instructions from Commerce and candid responses from Thai Union, supra Section IV.C.3(a), Commerce's determination can be upheld without resolution of the greater "issue of what the Department's policy or practice is with respect to the reporting universe for direct CEP sales." See Thai Union's Opposition at 17.

report in the next POR, as opposed to concealing them from Commerce, <u>id.</u> at 15; and

- Commerce did not cancel or postpone verification, as it had in instances where respondents submitted deficient information, <u>id.</u> at 15–16 (citations omitted).

Ad Hoc contends that AFA is appropriate because Thai Union "intentionally withheld information" from Commerce. Ad Hoc's Motion at 33.  However, Thai Union accurately responds by explaining as follows:

> [A] respondent cannot "intentionally withhold" information without first knowing that the Department has requested it.  Since the Department accepted Thai Union's explanations as to how it interpreted the supplemental questionnaire instructions, and since there is no evidence that Thai Union understood those instructions in the way that the Department intended, but then deliberately disregarded them, the record does not permit a finding of an intentional withholding of information.

Thai Union's Opposition at 24.

The record supports Commerce having acted within its broad discretion under 19 U.S.C. § 1677e(a) by not applying facts available to the subject direct CEP sales. See <u>NTN</u>, 28 CIT at 117.  In recognizing its contradictory instructions, Commerce justifiably concluded that Thai Union did not "withhold[] information" so as to trigger the application of facts available. 19 U.S.C. § 1677e(a)(2)(A); <u>see</u> <u>Decision Memo</u>, cmt. 13 at 38–41.  Thus, with respect to Commerce's decision to apply neither facts available nor AFA to the subject direct CEP sales, there exists "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Aimcor</u>, 154 F.3d at 1378 (quoting <u>Matsushita</u>, 750 F.2d at 933).

**(e)**
**Commerce properly excluded the subject Thai Union direct CEP sales to calculate margins**

Ad Hoc challenges Commerce's calculation of antidumping margins in the subject administrative review. Ad Hoc's Motion at 29–30.  According to Ad Hoc, "with respect to

certain unreported 'direct' CEP sales made by Thai Union, Commerce excluded these sales

volumes from Thai Union's U.S. sales quantity during the POR. . . .  In so doing, Commerce . . .

understated the assessment rate to be assigned to all non-investigated companies." Id.  Ad Hoc

frames this claim in terms of Commerce improperly and inexplicably including certain other

CEP and EP sales volumes in calculating margins. See id.  However, Defendant is correct that

"this attempt to reargue Commerce's conclusion that Thai Union was cooperative is

unpersuasive. . . . Commerce could not include the volume of the direct [CEP] sales that it

determined should be reported in the subsequent [POR] in its calculation of the review[-]specific

assessment rates for this [POR]." Defendant's Response at 26.  Accordingly, Commerce's proper

exclusion of the subject direct CEP sales from the relevant POR defeats Ad Hoc's challenge to

the margin calculations. See supra Section IV.C.3(d).

**D**
**Commerce Properly Included One Thai I-Mei CEP Sale**

Ad Hoc challenges Commerce's inclusion of a single CEP sale in the Thai I-Mei U.S.

sales dataset. Ad Hoc's Motion at 37–40.  Subsequent to the Preliminary Results, Ad Hoc

challenged the inclusion of Thai I-Mei CEP sales with sale dates prior to the beginning of the

POR. Ad Hoc Case Brief at 24–25.  In issuing the Final Results, Commerce agreed with Ad Hoc

for three such sales but retained the fourth as follows:

> [W]e find that it is not appropriate to include three of these transactions in our
> analysis because they had dates of sale, as well as entry dates, prior to the POR.
> As a consequence, these sales were covered by the 2004-2006 administrative
> review, and they should have been reported in the context of that segment of the
> proceeding.  Therefore, we have removed these three sales from the database for
> the final results of this review.
>
> Regarding the fourth sale at issue, however, we note that this sale was of subject
> merchandise which entered the United States during the current POR, but which

36

had a sale date (based on its date of shipment) falling within the prior POR.
Because we instructed Thai I-Mei in the 2004-2006 administrative review to
report only direct CEP sales . . . which entered U.S. customs territory during that
POR, the first opportunity to examine this particular transaction occurred during
this administrative review.  For this reason, we have maintained this sale in the
U.S. database for the final results, as it entered during this POR.

Decision Memo, cmt. 12 at 32.  Ad Hoc claims that the retention of this sale departs from

"Commerce's longstanding and consistent practice . . . to only include sales with sale

dates within the POR in a respondent's U.S. sales dataset." Ad Hoc's Motion at 38.

Inclusion of the remaining sale was proper.  Commerce "shall determine— (i) the

normal value and [EP] (or [CEP]) of each entry of the subject merchandise, and (ii) the

dumping margin for each such entry." 19 U.S.C. § 1675(a)(2)(A).  Including this sale

comports with the statutory requirement to examine and calculate margins for "each

entry." Id.  Commerce documented a principled basis for retaining the sale that supports

its determination. See Decision Memo, cmt. 12 at 32; Aimcor, 154 F.3d at 1378.

Defendant is correct that Commerce here rendered "a reasonable decision based upon the

facts surrounding a nonstandard sale." Defendant's Response at 27.

**E**
**The Rubicon Group CEP Offset Determination Is Remanded To Commerce**

In the Final Results, Commerce concluded "that the Rubicon Group has not demonstrated

that a CEP offset is warranted in this case." Decision Memo, cmt. 5 at 17.  The Rubicon Group

challenges this determination. The Rubicon Group's Motion.  However, Defendant, "after

examining the record, as well as the reasoning behind Commerce's determination [in a

subsequent administrative review] . . . , and without confessing error, . . .  request[ed] that the

Court remand this matter for Commerce to reconsider and further explain its decision as to

whether Rubicon is entitled to a [CEP] offset." Defendant's Response at 28.  Pursuant to the

Rubicon Group's Motion and Defendant's Response, a remand is granted for Commerce to

reconsider and further explain whether the Rubicon Group is entitled to a CEP offset.

**V**
**CONCLUSION**

For the above stated reasons, Ad Hoc's Motion for Judgment on the Agency Record is

DENIED, Defendant's request for a voluntary remand to address the Rubicon Group's Motion is

GRANTED, and Commerce's determination in <u>Certain Frozen Warmwater Shrimp From</u>

<u>Thailand: Final Results and Final Partial Rescission of Antidumping Duty Administrative</u>

<u>Review</u>, 73 Fed. Reg. 50,933 (August 29, 2008), is Affirmed In Part and Remanded in Part.

Commerce's determination is partially sustained and partially remanded for action consistent

with this Opinion.


                    __/s/ Evan J. Wallach____
                    Evan J. Wallach, Judge


Dated: December 29, 2009
       New York, New York

UNITED STATES COURT OF INTERNATIONAL TRADE

_____

|  |  |  |  |
|---|---|---|---|
| AD HOC SHRIMP TRADE ACTION COMMITTEE, | : | | |
| | : | | |
| Plaintiff, | : | | |
| | : | Before: | WALLACH, Judge |
| v. | : | Consol. Court No.: | 08-00283 |
| | : | | |
| UNITED STATES, | : | | |
| | : | | |
| Defendant, | : | | |
| | : | | |
| and | : | | |
| | : | | |
| PAKFOOD PUBLIC COMPANY LIMITED et al., | : | | |
| | : | | |
| Defendant-Intervenors. | : | | |

_____

## **ORDER**

This case having come before the court upon the Motion for Judgment on the Agency Record filed by Ad Hoc Shrimp Trade Action Committee ("Ad Hoc's Motion"); and the Motion for Judgment on the Agency Record filed by Andaman Seafood Co., Ltd., Chanthaburi Frozen Food Co., Ltd., Chanthaburi Seafoods Co., Ltd., Phatthana Seafood Co., Ltd., Phatthana Frozen Food Co., Ltd., Thailand Fishery Cold Storage Public Co., Ltd., Thai International Seafoods Co., Ltd., and Rubicon Resources, LLC ("the Rubicon Group's Motion"); the court having reviewed all papers and pleadings on file herein, having heard oral argument by each party, and after due deliberation, having reached a decision herein; now, in conformity with said decision, it is hereby

ORDERED that Ad Hoc's Motion is DENIED; and it is further

ORDERED that the Rubicon Group's Motion is DENIED except to the extent that it is further

ORDERED that this matter is remanded to the U.S. Department of Commerce to address whether to grant a constructed export price offset to the Rubicon Group; and it is further

ORDERED that all parties shall review the court's Opinion in this matter and notify the court in writing on or before Thursday, January 7, 2010, whether any information contained in the Opinion is confidential, identify any such information, and request its deletion from the public version of the Opinion to be issued thereafter.  The parties shall suggest alternative

language for any portions they wish deleted.  If a party determines that no information needs to be deleted, that party shall so notify the court in writing on or before Thursday, January 7, 2010.


                                        __/s/ Evan J. Wallach____
                                        Evan J. Wallach, Judge


Dated: December 29, 2009
       New York, New York

# NOTICE OF ENTRY AND SERVICE

This is a notice that an order or judgment was entered in the docket of this action, and was served upon the parties on the date shown below.

Service was made by depositing a copy of this order or judgment, together with any papers required by USCIT Rule 79(c), in a securely closed envelope, proper postage attached, in a United States mail receptacle at One Federal Plaza, New York, New York 10278 and addressed to the attorney of record for each party at the address on the official docket in this action, except that service upon the United States was made by personally delivering a copy to the Attorney-In-Charge, International Trade Field Office, Civil Division, United States Department of Justice, 26 Federal Plaza, New York, New York 10278 or to a clerical employee designated, by the Attorney-In-Charge in a writing filed with the clerk of the court.

or

Service was made electronically, by the Court's CM/ECF system, upon those parties that have filed a Notice of Consent to Electronic Service.

Tina Potuto Kimble
Clerk of the Court

Date: _____          By: _____
                                                        Deputy Clerk